IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DENISE STANA,**                                    Case No. 1:18 CV 21

     Plaintiff,

     v.                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Denise Stana ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in April 2015, alleging a disability onset date of November 30, 2012. (Tr. 16). Her claims were denied initially and upon reconsideration. (Tr. 160-62; 174-75). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 179). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 1, 2016. (Tr. 57). On April 19, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 16-36). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on January 4, 2018. (Doc. 1).

FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in 1971, and was 41 years old on her alleged onset date. (Tr. 214). She was 45 years old at the time of her administrative hearing. (Tr. 60). She lived with her two sons, ages ten and twelve. (Tr. 60-61). She had a high school education, graduating in 1989. (Tr. 61, 412). Plaintiff worked for ten years as a secretary in an insurance agency, leaving the job in November 2012. (Tr. 62; 260). She has not worked since then. (Tr. 260). In addition, Plaintiff previously worked at McDonald's. (Tr. 62-63). In a disability report, Plaintiff said bipolar disorder, depression, suicidal tendencies, and post-traumatic stress disorder ("PTSD") limited her ability to work. (Tr. 269).

At the hearing, Plaintiff testified she could not work because her medication turned her into "a zombie", causing drowsiness and hopelessness. (Tr. 65). She had suicidal thoughts, and attempted suicide six times. (Tr. 64-65). She preferred not to leave her home, except to go grocery shopping, and did not deal well with other people. (Tr. 64, 68). Plaintiff took Topomax, Prozac, Klonopin, Metformin, Zocar and Latuda. *Id.* She recently adjusted her medications after a crying episode, a desire to shoplift, and making a plan to commit suicide. (Tr. 66-67).

Plaintiff testified she started to "fall apart" when her mother died in November 2012. (Tr. 77). They were close, and she worked with her mother in the insurance agency, which was comprised of just Plaintiff, her mother, and "the boss." *Id.* She sought treatment from a therapist every other week and a psychiatrist once a month for the year prior to the hearing. (Tr. 67). Plaintiff no longer had an interest in activities she used to enjoy. (Tr. 75). She said her home typically had

toys on the floor and piles of clothes that need folding. (Tr. 79-80). She struggled to motivate herself. (Tr. 80).

Plaintiff felt claustrophobic around others. (Tr. 69). She testified she felt unsafe around men due to molestation as a child. *Id.* She visited the local pool with her children but the family kept to themselves when there. *Id.* She scheduled her grocery shopping to avoid the busiest times. *Id.* She attended her children's school functions, because being around children does not cause the same sorts of emotional distress as interacting with adults. (Tr. 76). She testified her concentration and memory were not good, and she shut down when criticized. (Tr. 72-73, 78). Plaintiff testified, on a typical day, she would go back to sleep after her children were picked up for school, even if she slept well the prior night. (Tr. 73, 78).

Relevant Medical Evidence

Plaintiff received sporadic mental health treatment at The Nord Center from May 2010 through February 2011 for mild symptoms of adjustment disorder with depressed mood. *See* Tr. 310. During a July 2010 diagnostic assessment, Plaintiff reported a recent break-up with her long-term (abusive) boyfriend which caused stress in her life. (Tr. 313). She reported symptoms of depression: feeling sad, worthless, and lonely. (Tr. 317, 319). On examination, Plaintiff was cooperative with an average demeanor, had a logical thought process, euthymic mood, and full affect. (Tr. 321). Providers diagnosed an adjustment disorder with depressed mood. (Tr. 320).

In October 2012, Plaintiff presented to Kala Ravichandran, M.D., at the Ohio Medical Group reporting a history of depression and cigarette use. (Tr. 370). Dr. Ravichandran prescribed Zoloft (an antidepressant) and Chantix to help quit smoking. *Id.* Plaintiff returned to Dr. Ravichandran in November 2012, for bloodwork. (Tr. 367). She reported increased stress. *Id.* Dr.

Ravichandran increased Plaintiff's antidepressant and advised her to watch her diet and quit smoking. (Tr. 367, 369).

In August 2013, Plaintiff presented to the Ohio Medical Group seeking treatment for depression from Matthew Schaeffer, M.D. (Tr. 365-66). She told Dr. Schaeffer she was under a lot of stress. (Tr. 365). She stopped taking her antidepressant because she thought the medication made the depression worse. *Id.* Dr. Schaeffer prescribed a different antidepressant and recommended counseling. (Tr. 365-66).

In September 2013, Plaintiff returned to Dr. Schaeffer with improved energy and a stabilized mood. (Tr. 363). The new antidepressant helped Plaintiff, though she believed the medication wore off during the day. *Id.* Dr. Schaeffer increased the antidepressant dosage and encouraged therapeutic lifestyle changes like weight loss and smoking cessation. (Tr. 363-64). During the visit, Plaintiff was alert, talked in normal speech patterns, had intact cognition, and had a normal mood and affect. (Tr. 363).

In early December 2013, Plaintiff followed up with Dr. Schaeffer, reporting she still struggled with depression. (Tr. 361). Dr. Schaeffer found her alert, with a normal mood and affect, intact cognition, and without evidence of hallucinations. *Id.* Plaintiff reported having suicidal thoughts. *Id.* Dr. Schaeffer encouraged Plaintiff to see a psychiatrist. *Id.*

She returned to The Nord Center in December 2013, with complaints of anger and depression. (Tr. 381). Plaintiff, with Nord Center staff assistance, developed an individual service plan, which included regular counseling. (Tr. 392). A mental status examination found Plaintiff well-groomed, with an average demeanor, eye contact, and activity. (Tr. 390). She spoke clearly, reported suicidal ideation without active intent, and bingeing and purging. *Id.* She reported no

delusions or hallucinations, and was logical and cooperative with a euthymic mood. *Id.* A licensed counselor diagnosed Plaintiff with mild major depressive disorder, and PTSD. (Tr. 389).

In February 2014, Plaintiff presented to Ilma Bokman, a counselor at The Nord Center. (Tr. 408-09). During the visit, Plaintiff's mood was euthymic and she was properly oriented. (Tr. 408). She was gregarious, laughing, and spoke loudly during the appointment. *Id.* Ms. Bokman noted Plaintiff was mildly depressed. *Id.* Plaintiff returned to Ms. Bokman on April 2, 2014, where she exhibited a "mild depressed" mood with normal behavior and functioning. (Tr. 406).

Two days later, Plaintiff reported to Dr. Schaeffer that her depression was worsening and she had stopped taking her antidepressant. (Tr. 357). Dr. Schaeffer noted Plaintiff was alert and had a normal mood and affect. *Id.* Her speech patterns were normal and her cognition seemed intact, with no evidence of hallucinations or psychotic features. *Id.* Dr. Schaeffer prescribed Topamax for mood stabilization. *Id*. Plaintiff followed up with Dr. Schaeffer about two weeks later. (Tr. 355). She told Dr. Schaeffer she was better on the Topamax. *Id.* She decreased her smoking, and her anxiety and mood were improved. *Id.*

Plaintiff presented to Deborah Johnson, her new counselor at The Nord Center, later in April 2014. (Tr. 404). Plaintiff told Ms. Johnson "she [wa]s doing pretty well" and that she wanted to apply for Social Security benefits. *Id.*

In May 2014, Plaintiff returned to Ms. Johnson, reporting that she had a strong support system of close friends. (Tr. 402). Ms. Johnson thought Plaintiff had made good progress toward her goals. *Id.*

In July 2014, Plaintiff told Ms. Johnson she continued to be angry with her mother's family, because she believed they ignored the pain her mother's death caused her. (Tr. 400). She relied on her support system of close friends during this time. *Id.* Ms. Johnson noted continued improvement

in Plaintiff's depressive symptoms at this appointment and at a subsequent appointment in August. (Tr. 398, 400).

In September 2014, Plaintiff met again with Dr. Schaeffer, reporting her depression improved but was still not controlled. (Tr. 350). Dr. Schaeffer found Plaintiff in no acute distress with normal mood and affect. *Id.* In October, Plaintiff told Dr. Schaeffer she continued to struggle with depression and mood stability. (Tr. 347).

The Nord Center referred Plaintiff to psychiatrist Theophilus Arthur-Mensah, M.D. (Tr. 529). She first presented to Dr. Arthur-Mensah on October 22, 2014, complaining of persistent depression and uncontrollable crying spells. *Id.* Plaintiff reported persistent suicidal ideation but concern for her children deterred a suicide attempt. *Id.* Dr. Arthur-Mensah diagnosed Plaintiff as bipolar disorder-depressed. (Tr. 530). During a November follow-up visit, Dr. Arthur-Mensah increased Plaintiff's antidepressant dosage. (Tr. 527).

In December 2014, Plaintiff returned to Dr. Schaeffer, who noted Plaintiff "seem[ed] to be doing a little bit better" and she had an improved mood. (Tr. 344).

During a January 2015 visit with Dr. Arthur-Mensah, Plaintiff reported her mood swings were returning worse than before, along with other symptoms like crying spells, staying in bed and excessive anger. (Tr. 466). Dr. Arthur-Mensah adjusted Plaintiff's medications and recommended follow-up appointments with a therapist. (Tr. 467). Plaintiff rated her psychiatric status as good. (Tr. 465). Dr. Arthur-Mensah found Plaintiff oriented and alert, with a cooperative manner, a euthymic affect, normal thought processes, feelings of hopelessness, normal perception, intact attention and concentration, intact cognition, and intact short-term and remote memory. (Tr. 466).

In February 2015, Plaintiff reported her anxiety had improved. (Tr. 463). William R. Chapman, Jr., a counselor supervised by Dr. Arthur-Mensah, noted Plaintiff had an intact thought process and appropriate behavior and functioning. *Id.*

Later in February 2015, Dr. Arthur-Mensah noted Plaintiff was depressed, irritable, angry, and anxious. (Tr. 458). She was stressed by bills, money, and providing for her children. (Tr. 460). She continued to have an intact thought process with appropriate behavior and functioning for her thought content and mood. (Tr. 461). Though she did not have control of her emotions or thoughts, Plaintiff reported her psychiatric status as good. (Tr. 457). Plaintiff decreased her daily activities. (Tr. 458). Dr. Arthur-Mensah's examination found Plaintiff was properly oriented, cooperative, had normal speech and language, a depressed, irritable, angry, and anxious mood, labile affect, normal thought processes, feelings of hopelessness and worthlessness, and normal perception. *Id.* Plaintiff had intact short-term and remote memory. *Id.* Dr. Arthur-Mensah increased Plaintiff's antidepressant dosage. (Tr. 459).

In March 2015, Plaintiff met with Mr. Chapman again, when she complained of increasing mood swings. (Tr. 455). She was stressed by providing food and clothing for her children, which were exacerbated by her sons' picky food taste. (Tr. 455-56). She told Mr. Chapman if the bills were paid, she was happy. (Tr. 456). Plaintiff had an intact thought process and appropriate behavior and functioning. *Id.*

In April 2015, Plaintiff told Mr. Chapman her condition stabilized and she solved some of her financial issues. (Tr. 451). She reported depression between a three and a five on a ten-point scale, but with increasing anxiety. (Tr. 452).

Later in April 2015, Plaintiff reported more mood swings and a worsened mental state to Dr. Arthur-Mensah, though her self-reported psychiatric status remained "good". (Tr. 448). She

felt the antidepressant improved her symptoms. (Tr. 449). Dr. Arthur-Mensah found Plaintiff neat in appearance, cooperative, depressed, and irritable with normal speech and language. *Id.* Plaintiff had a euthymic affect, normal thought processes, feelings of hopelessness and worthlessness, and normal perception with fair insight and judgment. *Id.* Dr. Arthur-Mensah diagnosed PTSD, borderline personality disorder, and bipolar disorder. (Tr. 450).

A few days later in April, Plaintiff told Mr. Chapman coloring and drawing helped her cope with stress and depressed feelings. (Tr. 447). In May 2015, Plaintiff reported that her finances improved and she spent more time with friends. (Tr. 445). She found a babysitter, which allowed her to spend more time with friends and coloring. *Id.* Her medication was working well. *Id.*

On May 12, 2015, Plaintiff presented to psychologist Ronald G. Smith, Ph.D., for a consultative examination in connection to her benefits application. (Tr. 411-18). She drove herself to the appointment. (Tr. 411). She told Dr. Smith she applied for disability because she "cannot function in any job". *Id.* She told Dr. Smith she did okay as a secretary, but by the end she was not doing well because of her mother's illness and her inability to get along with people. (Tr. 412). She thought the current medications were working better now than before. (Tr. 414). She had less anger, grief, and depression. *Id.*

Dr. Smith noted Plaintiff was cooperative and related well in "a rather jovial and energetic way." (Tr. 415). He noted Plaintiff's responses were direct and to-the-point, and her thinking was well-organized. *Id.* Plaintiff showed appropriate affective expression with a good range of affect, with no tearfulness during the interview. *Id.* Plaintiff told Dr. Smith most days were "not too bad". *Id.* Dr. Smith noted her insight seemed fair and her judgment seemed good. (Tr. 416).

Plaintiff told Dr. Smith she helped her children get ready for school in the morning, including packing their lunches and getting their clothes ready. (Tr. 416). After the children left,

she took care of the cat litter, did laundry, cooked meals, washed dishes, and got her "housework done". *Id.* She enjoyed shopping for groceries, because it got her out of the house. *Id.* She occasionally took her children out to eat. *Id.* After the interview, Dr. Smith diagnosed Plaintiff with acute stress disorder (in partial treatment remission); persistent depressive disorder (dysthymia) with intermittent major depressive episodes, with current episode in treatment remission; and other specified personality disorder (with histrionic features). (Tr. 417).

Later in May 2015, Plaintiff told Mr. Chapman she did not have to care for her children the prior weekend, so she slept a lot Friday, and went shopping and colored on Saturday. (Tr. 443). In June, Plaintiff reported her state of mind was better and that she was having less extreme emotional issues. (Tr. 440). Plaintiff rated her psychiatric status as "excellent". *Id.*

In June 2015, Plaintiff saw Dr. Arthur-Mensah and reported her mood was more stable after adding Prozac to her medications. (Tr. 438). Dr. Arthur-Mensah found Plaintiff had normal appetite, sleep, and energy. *Id.* Plaintiff was alert, cooperative, had normal speech and language, a more stable mood, euthymic affect, and normal thought processes. *Id.*

A few weeks later in June 2015, Plaintiff told Mr. Chapman she was experiencing horrible mood swings. (Tr. 434). In July, Plaintiff told Mr. Chapman she wanted to stay in bed and not leave. (Tr. 432). Later that month, Plaintiff reported her psychiatric status remained good. (Tr. 430). She continued to report providing for her children and finances as major stressors. *Id.*

In September 2015, Plaintiff told Dr. Arthur-Mensah she was arrested for shoplifting. (Tr. 543). She reported feeling depressed, with fleeting suicidal ideation. (Tr. 544). Dr. Arthur-Mensah noted mood instability. *Id.* In November 2015, Plaintiff reported her mood swings returned worse than before, but self-reported her psychiatric status was good. (Tr. 522). Dr. Arthur-Mensah noted Plaintiff was alert, cooperative, and spoke loudly with normal language. (Tr. 523). Plaintiff

appeared depressed, irritable and angry with a euthymic affect and normal thought processes. *Id.* Plaintiff felt hopelessness, but had normal perception, intact attention, concentration, cognition, and memory. *Id.*

In January 2016, Plaintiff told Mr. Chapman her son's medical issues caused her stress. (Tr. 539). She said her state of mind was worse than before, but rated her psychiatric status as excellent. *Id.* In February, Plaintiff reported the same psychiatric status and stressors. (Tr. 536). Her self-reported state of mind was worse than at her January appointment with her depression worsening. *Id.*

Later in February 2016, Dr. Arthur-Mensah found Plaintiff alert and cooperative with normal speech and language. (Tr. 534). She had a euthymic affect, appeared depressed, irritable, and anxious, with a normal thought process, and intact attention and concentration. *Id.* She felt hopeless. *Id.*

On February 26, 2016, Plaintiff went to the emergency room with complaints of suicidal ideation following a shoplifting arrest. (Tr. 583). She reported hearing auditory hallucinations, and toxicology screens were negative for drugs of abuse. *Id.* After two days of in-patient treatment, Plaintiff was less depressed and anxious, with intact cognition and memory and fair judgment, insight, and concentration. (Tr. 588).

In March 2016, Plaintiff told Mr. Chapman her state of mind improved. (Tr. 531). Mr. Chapman noted Plaintiff had a good prognosis and made good progress. (Tr. 532).

In April 2016, Plaintiff told Dr. Arthur-Mensah she was doing better since her last appointment and that she was in control of her emotions and actions, but not her thoughts. (Tr. 607). Dr. Arthur-Mensah found Plaintiff alert, cooperative, and with normal speech and language. (Tr. 608). Plaintiff's mood was euthymic, irritable, angry and anxious. *Id.*

Later in April 2016, Plaintiff told Mr. Chapman her depression was a two out of ten, and her anxiety a three out of ten. (Tr. 605). In May 2016, Plaintiff self-reported her psychiatric status as excellent. (Tr. 602). One week later, she continued to rate her psychiatric status as excellent, noting it had been a good week. (Tr. 600-01).

In June 2016, Plaintiff reported feeling more stable in her moods to Dr. Arthur-Mensah. (Tr. 596). Her major stressor was her own health. (Tr. 595). Dr. Arthur-Mensah's examination found Plaintiff alert, cooperative, with normal speech and language. (Tr. 596). She had a euthymic affect, normal thought processes, normal perception, and intact attention and concentration. *Id.*

In September 2016, Plaintiff told Dr. Arthur-Mensah her sleep was interrupted, her mood was less depressed, and her irritability was high (Tr. 593), but her psychiatric status was good (Tr. 592). Her affect was blunted and labile, and she was alert, cooperative, with a depressed, irritable, and anxious mood. (Tr. 593). She had normal thought content and intact attention and concentration. *Id.*

Opinion Evidence

*Treating Physicians*

In November 2016, Dr. Schaeffer completed a medical source statement. (Tr. 647-49). Dr. Schaeffer believed Plaintiff would: 1) need five-minute breaks every 15 to 30 minutes; 2) be off task more than 25 percent throughout the day; and 3) be absent two-to-three days per month. (Tr. 648-49).

In December 2016, Dr. Arthur-Mensah completed a medical source statement. (Tr. 651-53). He diagnosed bipolar disorder, impulse control disorder, and borderline personality disorder. (Tr. 651). Dr. Arthur-Mensah wrote Plaintiff had "not responded well to multiple medications regimes," and was "frequently overwhelmed by multiple psychological stressors". *Id.* She was

"highly symptomatic most of the time". *Id.* Dr. Arthur-Mensah indicated Plaintiff would be off-task greater than 25 percent of her work time, and would miss work about 30 percent of the time. (Tr. 651-52). He noted Plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods, and in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 652). He stated Plaintiff was markedly limited in her ability to complete a normal workday without interruptions from psychologically based symptoms, and to set realistic goals or make plans independently of others. (Tr. 652-53).

*Examining Physicians*

During his May 2016 consultative examination, Dr. Smith noted Plaintiff may have some difficulty maintaining adequate attention and concentration, and maintaining persistence at simple or more complex tasks due to feelings of depression or anxiety. (Tr. 417). He opined Plaintiff may have difficulty dealing appropriately with supervisors or coworkers. *Id.* He further opined Plaintiff may not deal effectively with interpersonal work pressures due to triggers that remind her of abusive events or experiences. (Tr. 418). He opined Plaintiff appeared capable of understanding, remembering, and carrying out job instructions. (Tr. 417).

Also in June 2015, Plaintiff presented to Kyle E. Walker, M.D., for a physical consultative exam for her disability benefits application. (Tr. 420-26). Plaintiff told Dr. Walker she felt unable to work, citing her two autistic children and a lack of a support system for their care. (Tr. 420). She added part of why she did not work was her dislike of other people. *Id.* Dr. Walker reported Plaintiff believed the largest factors preventing her from returning to work was a lack of support structure for her children and her dislike of people. (Tr. 422). He found Plaintiff had no limitations

with sitting, standing, walking, lifting, carrying, handling, hearing, speaking, traveling, or with her memory. *Id.*

*Reviewing Physicians*

In June 2015, Tonnie Hoyle, Psy.D., reviewed Plaintiff's mental health record. (Tr. 96, 99-102). Dr. Hoyle found evidence of an affective disorder, anxiety related disorder, and personality disorder. (Tr. 96). Because of those restrictions, Plaintiff would have mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. *Id.* He opined Plaintiff could perform simple, repetitive, and moderately complex tasks in settings without demands for a fast pace or high production. (Tr. 100). He opined Plaintiff retained the capacity for occasional, superficial social interactions and could adapt to minor and infrequent changes in the work setting. (Tr. 101). In October 2015, state agency psychologist Katherine Fernandez, Psy.D., reviewed Plaintiff's file and concurred with Dr. Hoyle's opinions. (Tr. 129-30, 133-36).

VE Testimony

A vocational expert appeared and testified at the hearing before the ALJ. (Tr. 80-86). The ALJ asked the VE to consider an individual with Plaintiff's age, education, and work experience, who was limited in the way the ALJ determined Plaintiff was. (Tr. 23, 80-84). The VE testified such an individual could not perform Plaintiff's past work, but could perform other jobs in the national economy such as a cafeteria attendant, plastic hospital products assembler, or an electrical accessories assembler. (Tr. 84).

ALJ Decision

In her April 19, 2017 decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful

activity since her alleged onset date of November 30, 2012. (Tr. 18). She had severe impairments, including anxiety, depression, stress disorder, bipolar, borderline personality disorder, impulse control disorder, posttraumatic stress disorder (PTSD), obesity, arthritis, lumbar radiculitis, lumbar spondylolisthesis, lumbar degenerative disc disease, degenerative lumbar/lumbosacral inter disc, thoracic or lumbar spondylosis without myelopathy and mitral regurgitation but these impairments did not meet, or medically equal, the severity of a listed impairment individually or in combination. (Tr. 19-20). After consideration of the record, the ALJ concluded Plaintiff had the residual functional capacity ("RFC") to:

> perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can occasionally climb ladders, ropes, or scaffolds. The claimant can frequently stoop, crouch, and crawl. The claimant can never be exposed to unprotected heights or dangerous moving mechanical parts. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work). The claimant can occasionally tolerate changes in a routine work setting. Changes should be well explained and introduced slowly. The claimant can occasionally interact with supervisors, coworkers and the public.

(Tr. 23).

The ALJ then concluded Plaintiff was unable to perform any past relevant work. (Tr. 33). However, considering Plaintiff's age, education, work experience, and RFC, she could perform other jobs that exist in significant numbers in the national economy. (Tr. 34). Therefore, the ALJ concluded Plaintiff was not disabled from her alleged onset date of November 30, 2012, through the date of her decision. (Tr. 35).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two arguments, both connected to the ALJ's RFC determination. (Doc. 13, at 11). First, Plaintiff argues the ALJ erred in assigning partial weight to Dr. Arthur-Mensah, Plaintiff's treating physician. *Id.* at 13-14. Second, Plaintiff argues the ALJ erred in assigning Dr. Smith, an examining physician, partial weight. *Id.* at 14-15. The Commissioner argues the ALJ's weighing of opinion evidence, Plaintiff's subjective complaints, and the ultimate RFC determination were all supported by substantial evidence. (Doc. 14, at 15-24). For the following reasons, the undersigned finds the Commissioner's decision not supported by substantial evidence and remands the decision for further consideration of Dr. Smith's opinion.

*Dr. Arthur-Mensah*

Plaintiff regularly saw Dr. Arthur-Mensah for more than two years, making him Plaintiff's treating psychiatrist.[1] Generally, medical opinions of treating sources are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating source's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004))[2].

Importantly, the ALJ must give "good reasons" for the weight she gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010).

---

1. "Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

2. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, she is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

In this case, the ALJ summarized Dr. Arthur-Mensah's opinion, and assigned it partial weight, explaining:

> The undersigned finds that Dr. Arthur-Mensah's opinion regarding functioning that was not significantly limited or moderately limited is consistent with the record as a whole, but marked limitation regarding functioning is are not supported by the record. For example, the objective evidence showed that the claimant was cooperative, polite, well groomed with good hygiene, made average eye contact, showed clear, normal speech, and had intact memory, cognition, attention, concentration, appropriate flow of ideas, and fair to good insight and judgment (Ex. 2F/9-24, 3F/17, 4F/6-7, 5F/4, 6F/12, 23, 32, 40, 7F/7, 10, 19-34, 9F/4, 14, 10F/11, 29, 38, 41, 43, 11F/3, 6, 18, 12F/3, 10, 20, 13F/4). Further, the claimant's ability to engage in activities on a regular basis, such as driving, shopping, cooking, performing household chores and tasks, using a computer to pay bills and for social media, attending school events, interacting with school and medical professionals, and socializing with friends does not support marked limitations (Hearing Record, 12/1/2016, Ex. 3F/9, 27, 29, 6F/17, 19, 21, 28). Therefore, the undersigned gives Dr. Arthur-Mensah's opinion partial rather than controlling weight.

(Tr. 33).

The ALJ found Dr. Arthur-Mensah's "not significantly limited" or "moderately limited" opinions consistent with the record as a whole, but rejected his "marked limitation" opinions as unsupported by the record. *Id.* Dr. Arthur-Mensah found marked limitations in Plaintiff's ability to maintain attention and concentration for extended periods; her ability to perform activities

18

within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and her ability to set realistic goals or make plans independently of others. (Tr. 652-53). The ALJ cited Plaintiff's cooperative, polite demeanor with clear normal speech and intact mental faculties and her daily activities, including raising her two children, as objective evidence inconsistent with Dr. Arthur-Mensah's opinions. (Tr. 33).

Plaintiff condenses Dr. Arthur-Mensah's opinions to say the ALJ found her markedly limited in her ability to maintain attention, concentration, persistence and pace throughout the workday. (Doc. 13, at 14). She then argues the ALJ's reliance on Plaintiff's ability to socialize and interact with school and medical professionals is misplaced, because Dr. Arthur-Mensah did not find Plaintiff restricted in any areas of social interaction. *Id.* Additionally, Plaintiff questions the ALJ's reliance on her ability to complete household chores, since Plaintiff testified toys are left on the floor (Tr. 79) and clothes are left unfolded (Tr. 90). *Id.*

These arguments are unpersuasive. Treatment notes from multiple sources consistently noted Plaintiff had intact cognition, memory, attention, concentration, and an appropriate flow of ideas with fair to good insight and judgment. *See* Tr. 361 (Dr. Schaeffer, December 2013, noted intact cognition); Tr. 363 (Dr. Schaeffer, September 2013, noted intact cognition); Tr. 438 (Dr. Arthur-Mensah, June 2015, noted normal speech and language, normal thought process, and normal perception, attention, and concentration); Tr. 449 (Dr. Arthur-Mensah, April 2015, noted normal thought process, perception, intact attention and concentration, with fair insight and judgment); Tr. 458 (Dr. Arthur-Mensah, February 2015, noted normal thought process, normal perception, intact cognition, intact short-term and remote memory, with fair insight and judgment);

Tr. 466 (Dr. Arthur-Mensah, January 2015, noted normal thought process, normal perception, intact attention and concentration, intact cognition, and intact memory, with fair insight and judgment); Tr. 534 (Dr. Arthur-Mensah, February 2015, noted normal thought process, with intact attention and concentration, and fair insight and judgment); Tr. 588 (hospital progress note, February 2016, noted intact cognition and memory, with fair concentration, insight, and judgment); Tr. 593 (Dr. Arthur-Mensah, September 2014, noted normal thought process, with intact concentration and fair insight and judgment); Tr. 596 (Dr. Arthur-Mensah, June 2016, noted normal thought process, normal perception, intact attention and fair insight and judgment); Tr. 608 (Dr. Arthur-Mensah, April 2016, noted normal thought process, normal perception, intact attention and concentration, with fair insight and judgment). As the ALJ noted, these findings are inconsistent with marked limitations in the ability to maintain attention and concentration, to remain on schedule, and to complete a normal work day without an unreasonable number of rest periods. (Tr. 33); *Hartsough v. Comm'r of Soc. Sec.*, 2018 WL 1466800 at *9-10 (S.D. Ohio) (holding similar objective findings in treatment notes inconsistent with a treating source's similarly restrictive opinions constituted good reasons for discounting that treating source opinion).

Further, unfolded laundry and scattered toys do not negate Plaintiff's role as primary caregiver to her two children. (Tr. 365, 395, 420). The ability to successfully raise children can provide substantial evidence that undercuts a treating source's finding of marked limitations in maintaining attention and concentration. *See Lee v. Comm'r of Soc. Sec.*, 2013 WL 6116814 at *10 (N.D. Ohio) (holding activities of daily living, including raising children, qualified as good reasons for discounting a treating source's marked limitation in sustaining a routine without supervision). These findings provide substantial evidence to support the ALJ's decision to discount a treating source's opinion. Additionally, discounting a treating source opinion based on

inconsistency with the record as a whole and a lack supportability based on that source's own treatment notes satisfy the "good reasons" requirement for discounting treating sources. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)).

Plaintiff argues the ALJ did not consider the fluctuating symptoms noted throughout her lengthy treatment history. (Doc. 13, at 14). She accurately recounts times of varying mental illness symptoms *id.*, but even as those symptoms oscillate, her thought process, perception, concentration and judgment remained mostly stable. For example, when Plaintiff reported to Mr. Chapman in June 2015 complaining of horrible mood swings, she still rated her own psychiatric status as good, and Mr. Chapman found her thought process intact and her behavior and functioning appropriate. (Tr. 434-35). In February 2016, Plaintiff told Dr. Arthur-Mensah her depression was worsening, but also self-reported her psychiatric status as excellent and Mr. Chapman again noted an intact thought process with appropriate behavior and functioning. (Tr. 536-38). Plaintiff did have an inpatient psychiatric hospitalization, but as the ALJ noted, her symptoms improved with treatment. (Tr. 28) ("Although the claimant experienced an inpatient hospitalization due to a mental health exacerbation, the claimant's symptoms resolved with treatment.") (citing Tr. 553, 556, 588). Even when Dr. Arthur-Mensah noted Plaintiff's irritability, anger, and anxiety, he still found a normal mood, affect, thought process, and perception, with fair judgment and insight. (Tr. 608). While Plaintiff's symptoms fluctuated throughout her treatment history, those fluctuations did not affect the evidence the ALJ relied on to find Dr. Arthur-Mensah's opinion inconsistent with the record and not supported by his own treatment notes. The ALJ did not cherry-pick the good days from the record and ignore the bad, but instead reviewed the record in its entirety and found Dr. Arthur-Mensah's opinion inconsistent with that record, because even during times of worsening symptoms Plaintiff maintained an intact thought process and a normal mood and thought process. *See DeLong*

21

*v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) ("Both claims are reducible to an allegation that DeLong levied against the ALJ below—"cherry picking" the record. The District Court observed that this allegation is seldom successful because crediting it would require a court to re-weigh record evidence. It is no more availing on appeal.").

The ALJ properly discounted Dr. Arthur-Mensah's opinion, based on its inconsistency with the record as a whole, and because it is not supported by his own treatment notes. (Tr. 33). Inconsistency with the record and lack of support in treatment notes are both "good reasons" sufficient to meet the regulatory requirement. *Rabbers*, 582 F.3d at 660. Therefore, the undersigned finds no error in the ALJ's assessment of Dr. Arthur-Mensah's opinion.

### *Dr. Smith*

Plaintiff also argues the ALJ erred in her assessment of Dr. Smith's opinion. (Doc. 13, at 14-15). Dr. Smith, a consultative examiner, opined Plaintiff had several mental limitations. (Tr. 411-18). Plaintiff argues the ALJ failed to incorporate into the RFC a restriction the ALJ expressly found supported. (Doc. 13, at 15). The Commissioner, in response, argues there is no inconsistency between Dr. Smith's opinion and the ultimate RFC. (Doc. 14, at 19). For the following reasons, the undersigned remands the opinion for further consideration of Dr. Smith's opinion.

An examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527, 404.1502, 416.927(b), 416.902; SSR 96-2, 1996 WL 374188, at *1. This includes State agency physicians whose opinions must be considered by the ALJ. *Id*. Here, Dr. Smith examined Plaintiff once for a psychological assessment. (Tr. 411). The ALJ is required to weigh the opinion of agency examining physicians under the same factors as treating physicians, including the supportability and consistency of those opinions. *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d). Although the explanatory requirement

22

"does not apply to opinions from physicians who . . . have examined but not treated a claimant, the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011). Thus, the question is not one of "good reasons", but rather whether the ALJ's reasoning in this regard allows the appellate court to trace the path of her reasoning. *Id.* (citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.1995)).

The ALJ, as required, considered Dr. Smith's opinion and explained her reasoning for assigning it partial weight:

> Dr. Smith opined that the claimant would appear to be capable of understanding, remembering, and carrying out job instructions (Ex. 4F/8). Dr. Smith further opined that the claimant may have some difficulty maintaining adequate attention and concentration and maintaining persistence at simple or more complex tasks. In addition, the claimant may have some difficulty dealing appropriately with supervisors or coworkers due to reduction in tolerance for frustration and stress and may not deal very effectively with interpersonal work pressures due to the possibility that various triggers may remind her of abusive events or experiences (Ex. 4F/9). Dr. Smith opined that the claimant would appear to be capable of handling funds. The undersigned finds that no limitation with understanding, remembering, and carrying out is inconsistent with the record that showed the claimant experienced side effects from her medication, such as fogginess and increased sleep (Hearing Record, 12/1/2016). However, the undersigned finds Dr. Smith's opinion regarding only some difficulty with concentration, persistence, and pace, and interpersonal interactions is supported by the record that showed, despite some exacerbations of symptoms, the claimant generally remained cooperative, had normal speech, intact cognition, judgment, and insight, appropriate flow of ideas, and engaged in activities, such as managing the household, using the computer for social media and to pay bills, shopping, driving, and attending appointments and recreational and social events (Hearing Record, 12/1/2016, Ex. 2F/9-24, 3F/9-29, 6F/12-40, 7F/19-34, 9F/4, 14, 10F/11-43, 11F/3, 6, 18, 12F/3, 20, 13F/4). Accordingly, the undersigned gives partial weight to Dr. Smith's opinion.

(Tr. 31).

To summarize, Dr. Smith provided four functional opinions. (Tr. 417). First, he opined Plaintiff appeared to be capable of understanding, remembering, and carrying out job instructions,

which the ALJ found inconsistent with the record, in that the record showed Plaintiff's medication side effects would cause her difficulty in that functional area. (Tr. 31, 417). Second, Dr. Smith opined Plaintiff may have some difficulty maintaining adequate attention and concentration, and maintaining persistence at simple or more complex tasks. (Tr. 417). Third, Dr. Smith also opined Plaintiff may have some difficulty dealing appropriately with supervisors or coworkers. *Id.* Fourth, he opined she may not deal effectively with interpersonal work pressures. (Tr. 417-18). These opinions were all considered supported by the ALJ. (Tr. 31).

The ALJ is not required to adopt a particular opinion verbatim, regardless of the weight assigned. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). However, if a medical source's opinion contradicts the ALJ's RFC finding, an ALJ must explain why he did not include the medical source's limitation in his determination of the claimant's RFC. *See* SSR 96-8p, 1996 WL 374184, at *7. Social Security Ruling 96-8p provides: "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* Courts in the Northern District of Ohio have held that an ALJ's failure to comply with this regulation requires reversal. *See Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (ALJ's failure to address a medical source's opinion which conflicted with RFC constituted reversible error); *Thompson v. Comm'r of Soc. Sec. Admin*, 2014 WL 356974, at *4 (N.D. Ohio) (remanding because ALJ did not explain why she failed to adopt in the RFC a conflicting limitation assigned by medical sources); *Moretti v. Colvin*, 2014

24

WL 37750, at *10 (N.D. Ohio) (remanding because ALJ failed to explain why she did not include in the RFC a limitation assigned by a medical source).

The issue, then, is whether the opinion the ALJ credited is impermissibly inconsistent with the RFC she adopted. Dr. Smith opined Plaintiff "may have some difficulty maintaining adequate attention and concentration and maintaining persistence at simple or more complex tasks. This may be due to her occasional feelings of depression or anxiety that might be caused by triggers that remind her of past traumatic experiences." (Tr. 417). In her RFC, the ALJ found Plaintiff "can understand, remember, and carry out simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work). . . . [and] can occasionally tolerate changes in a routine work setting." (Tr. 23). This RFC accounts for the pace restrictions offered by Dr. Smith by restricting her from production rate pace. However, a restriction to changes in her work environment is insufficient to account for moderate restrictions in maintaining adequate attention and concentration. *See Hambrick v. Comm'r of Soc. Sec.,* 2014 WL 1961945, at *5 (S.D. Ohio) ("A limitation on changes in a routine work setting simply is not equivalent to limitations in persistence and concentration, or an inability to work at a fast pace or to meet production quotas."), *report and recommendation adopted,* 2014 WL 2589317; *Tolles v. Comm'r of Soc. Sec.,* 2013 WL 5707788, at *9 (E.D. Mich.) ("The ALJ's limitation to 'simple routine tasks with only an occasional change in routine work setting' accounts for Plaintiff's moderate limitation in her ability to understand and remember detailed instructions. . . . But the ALJ's RFC finding does not account for his finding that Plaintiff had moderate limitations in concentration, persistence, or pace."). Similarly, courts have found a restriction to routine and repetitive tasks does not adequately encompass finding a plaintiff moderately restricted in concentration, persistence, and pace. *Makan v. Covlin*, 2013 WL 990824, at *2 (N.D. Ohio) ("The Court finds that on the facts of this case, the hypothetical, which

included only restrictions to "simple, routine, and repetitive tasks," fails to account for the ALJ's determination that plaintiff is moderately limited in concentration, persistence, or pace."); *Janda v. Comm'r of Soc. Sec.,* 2013 WL 3200611, at *5 (N.D. Ohio) ("Likewise, courts in this circuit have generally held that an ALJ's hypothetical question or RFC must contain something more than a limitation to "simple, repetitive, routine work" in order to properly account for a claimant's moderate deficiency in concentration."); *McNemar v. Astrue*, 2011 WL 5554051, at *8 (N.D. Ohio) ("Although the ALJ's written decision states that he was limiting McNemar to simple, routine work due to her BIF, the undersigned is not persuaded that the ALJ's decision to limit Plaintiff to this type of work adequately conveyed McNemar's moderate limitation in concentration, persistence and pace."), *report and recommendation adopted sub nom. McNemar v. Comm'r of Soc. Sec.*, 2011 WL 5586378.

Dr. Smith, in his opinion, specifically opined Plaintiff's attention and concentration difficulties may manifest in simple tasks. (Tr. 417) ("[S]he may have some difficulty maintaining adequate attention and concentration and maintaining persistence at simple or more complex tasks")). The ALJ explicitly stated she credited this portion of the opinion. (Tr. 31). Therefore, a restriction to simple, routine, and repetitive tasks does not encompass the moderate attention and concentration difficulties the ALJ found supported. *Ealy*, 594 F.3d at 516. This distinction is illustrated in a subsequent Sixth Circuit case, where the distinction between a general restriction on attention and concentration and a medical opinion finding attention and concentration restrictions even at simple tasks is highlighted. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016). In *Kepke*, the Sixth Circuit explained:

> *Ealy* is distinguishable from Kepke's case, however, because there, one of the claimant's doctors specifically limited his ability to sustain concentration to 'simple repetitive tasks [for] "[two-hour] segments over an eight-hour day where speed was

not critical."' Kepke, however, has not cited to any evidence in the record that
provides for specific, concrete limitations on her ability to maintain concentration,
persistence or pace while doing simple, unskilled work.

*Id.* (internal citation omitted). Because the ALJ credited Dr. Smith's opinion, which included

restrictions of simple tasks, and did not account for that restriction in the RFC, the decision is not

supported by substantial evidence and remand is required.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the

undersigned finds the Commissioner's decision denying DIB and SSI not supported by substantial

evidence and reverses and remands that decision for further proceedings pursuant to Sentence Four

of 42 US.C. § 405(g).


 s/James R. Knepp II
United States Magistrate Judge